STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-16-07

RONALD A. BOUTET, BARBARA A.  )
BOUTET, INC. & PINE RIDGE  )
REALTY CORPORATION,  )
                                                )
                     Petitioners,  )
                                                )
v.  )
                                                )
RESIDENTS OF THE TOWN OF OLD  )
ORCHARD BEACH, TOWN OF OLD  )
ORCHARD BEACH PLANNING  )
BOARD, & DOMINATOR GOLF, LLC  )
                                                )
                     Respondents.  )

**Order on M.R. Civ. P. 80B Appeal**

Petitioners Ronald A. Boutet, Barbara A. Boutet, Inc. and Pine Ridge Realty Corporation

challenge the April 22, 2015 Decision of the Planning Board for the Town of Old Orchard Beach

approving an amendment to the Dunegrass Subdivision permitting the development of 24

single-family style condominium homes and lots. The circumstances underlying this appeal

have given rise to three additional actions pending before this court.[1] At their core, the disputes

center around the ability to develop housing units within the Dunegrass Subdivision. For the

reasons discussed below, the court affirms the Planning Board's April 22, 2015 Decision.

I.     **Background**

[1] BCD-AP-16-06 challenges a subsequent Decision from the Town's Planning Board approving the development of an additional 8 single-family lots; BCD-CV-16-09 seeks a declaratory judgment regarding the force of development rights within the Dunegrass Subdivision; and BCD-CV-16-11 seeks relief for an alleged breach of a Purchase and Sale Agreement between Pine Ridge Realty Corporation and Dominator Golf, LLC.

On December 10, 1987, the Planning Board for the Town of Old Orchard Beach ("Planning Board") unanimously granted final approval to the "Dunegrass Subdivision [and] Five Hundred and Eighty-Nine (589) Unit Condominium[s]" on December 10, 1987. (R. 1.) On July 5, 1988, the Maine Department of Environmental Protection ("DEP") issued a Site Location Order approving, with certain conditions, the application of Sealand Development Company Inc. ("Sealand") to develop the Dunegrass Subdivision. (R. 3 at BK 5083, PG 233.) The development project was described as containing a residential community of 95 single-family homes and 494 attached duplexes for a total unit count of 589. (*Id.* at BK 5083, PG 219.) The residential communities were to be broken down into sections A-R and could be developed by the applicants or subcontracted out for development. (*Id.*; R. 2.[2]) The maximum development of residential units in any single year was capped at 150. (*Id.*)

Shortly after the DEP approval, the Planning Board recorded a Declaration of Conditions governing the development of the Dunegrass Subdivision that were agreed to by Sealand and the Town of Old Orchard Beach (the "Town"). (R. 18, Attachment 3 at BK 5083, PG 216-218.) The Declaration of Conditions provided, among other things, that the "agreement will remain with the property" and that all "[l]andowners must adhere to the conditions" set out therein. (*Id.* at BK 5083, PG 216.) The Declaration of Conditions further stated that its intent was "to concurrently develop the recreational portion of Dunegrass (primarily the golf course) with the residential development as delineated on the Site Plan...." (*Id.*) The Site Plan depicts the proposed 18-hole golf course and 589 residential units proposed for the Dunegrass Subdivision.

---

[2] While the DEP Approval provides that Dunegrass Subdivision is divided into sections "A-Q," this appears to be in error as the Site Plan relied upon by the DEP clearly shows Sections A through R. This error is likely because Section Q of the Subdivision represents the southernmost section of the Dunegrass Development. (R. 2; *see also* R. 18, Attachment 3, BK 5083 PG 216).

2

(*See* R. 2.) The Site Plan proposed the 589 residential units be distributed throughout Sections A-R of the Dunegrass Subdivision as described in the table below:

| | |
|---|---|
| Section A | 28 units |
| Section B | 76 units |
| Section C | 46 units |
| Section D | 40 units |
| Section E | 48 units |
| Section F | 3 units |
| Section G | 88 units |
| Section H | 5 units |
| Section I | 5 units |
| Section J | 4 units |
| Section K | 56 units |
| Section L | 72 units |
| Section M | 40 units |
| Section N | 22 units |
| Section O | 27 units |
| Section P | 10 units |
| Section Q | 15 units |
| Section R | 4 units |
| **Total Unit Count** | **589 units** |

3

(*Id.*) This distribution is reflected on the Site Plan itself as informed by the Legend on the first page. (*Id.* at Ex. B1.)

On June 6, 1989, Sealand, through its Treasurer Ronald A. Boutet, executed a Declaration of Covenants, Conditions, and Restrictions for the Dunegrass Subdivision ("DCCR"). (R. 4.) The intent of the DCCR was "to impose upon the Properties…mutually beneficial restrictions under a general plan of improvement for the benefit of all owners of real property within the Properties." (R. 4 at BK 5083, PG 043.) Sealand "desire[d] to provide a flexible and reasonable procedure for the overall development of the Properties, and to establish a method for the administration, maintenance, preservation, use and enjoyment of such Properties as are now or hereafter subjected to this Declaration[.]" (*Id.*)

On May 28, 1993, Ronald A. Boutet, acting as President of Sealand, granted land to Pine Ridge Realty Corporation ("Pine Ridge"), through its President Ronald A. Boutet, in Sections A, B, C and I of the Dunegrass Subdivision. (R. 5.) In 2001, the Town adopted a Planned Mixed Use Development ("PMUD") Zoning Ordinance. (*See* R. 23-25.) Over the years, amendments have been made to the original Subdivision Approval that adjust and/or alter the number of residential units to be constructed in individual residential sections within Dunegrass. (*See* R. 17, Exs. 1, 3, 4, 5.)

On December 5, 2008, Pine Ridge entered into a Purchase and Sale Agreement with Domenic Pugliares, on behalf of Dominator Golf, LLC ("Dominator") for the Golf Course within the Dunegrass Subdivision, Unit Sites 149, 150, and 151, and other related properties. (R. 6.) In conjunction with this Agreement, Pine Ridge executed a Warranty Deed in favor of Dominator for the land at issue in the Purchase and Sale Agreement. (*See* R. 6, 7.) In August of

4

2012, Dominator and Petitioners entered into a Memorandum of Understanding ("MOU") that provided, in pertinent part, Pine Ridge would transfer "development rights to up to fifteen (15) unit sites from the unused inventory of unit sites in Section B of the Dunegrass development to allow Dominator to apply to the Old Orchard Beach Planning Board for the development of the Maintenance Area" in exchange for the sum of $15,000.00 per lot or unit site upon the sale to a third party of the lots at issue. (R. 8 at 1.) Pine Ridge also agreed to "transfer the development rights to up to four (4) unit sites from the unused inventory of unit sites in Section B of the Dunegrass development" to allow Dominator to apply to the Planning Board for the development of single-family lots or unit sites in exchange for $20,000.00 per lot or unit site upon the sale to a third party of the lots at issue. (*Id.* at 2.) The Planning Board subsequently granted Dominator approval to develop four units and then an additional eleven. (*See* R. 16 at Ex. B-1, B-2, R. 10 at p. 1.)

Dominator initially notified the Planning Board of its intention to apply for an amendment to the Dunegrass Subdivision to develop "The Turn" with the submission of a sketch plan on June 16, 2014. (R. 11(A).) The amendment originally sought to construct 26 residential units on a 2.228 acre parcel along Wild Dunes Way in Dunegrass. (*Id.*) The Planning Board reviewed the initial proposal in meetings on July 10 and October 9, 2014. (R. 21(A), (B).)

On December 26, 2014, Dominator submitted a Subdivision Preliminary Application and Plans for The Turn in which the number of units was reduced to 24. (R. 11(C).) The Planning Board reviewed the Application on January 8, 2015 and scheduled a site walk for February 5, 2015, and a public hearing on February 12, 2015. (R. 21(C) at pp. 24-25.) On March 12, 2015, the Planning Board approved Dominator's Application with a number of conditions including

5

that the Town Planner verify the unit count and minimum open space calculations submitted by Dominator. (R. 10 at 6, R. 21(E) at 29-30, 32.) On April 10, 2015, Petitioners filed the instant appeal. Twelve days later, the Planning Board met to review the unit count and open space calculations and to sign the Final Plan and Findings of Fact. (R. 10, R. 21(F).)

## II.    Standard of Review

Pursuant to M.R. Civ. P. 80B, the Planning Board's Decision is reviewed for error of law, abuse of discretion, and findings not supported by substantial evidence in the record. *Summerwind Cottage, LLC v. Town of Scarborough*, 2013 ME 26, ¶ 11, 61 A.3d 698. "Substantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion." *Trudo v. Town of Kennebunkport*, 2008 ME 30, ¶ 7, 942 A.2d 689 (quoting *Griswold v. Town of Denmark*, 2007 ME 93, ¶ 9, 927 A.2d 410). That inconsistent conclusions can be drawn from evidence does not mean that a finding is not supported by substantial evidence. *Toomey v. Town of Frye Island*, 2008 ME 44, ¶ 12, 943 A.2d 563. To vacate the findings of the Planning Board, the petitioner must demonstrate either "that no competent evidence supports the Planning Board's conclusions" or "that the record compels [a] contrary finding[.]" *Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 12, 750 A.2d 577; *Total Quality, Inc. v. Scarborough*, 588 A.2d 283, 285-86 (Me. 1991). The court reviews the Planning Board's findings of fact deferentially and may not substitute its own judgment for that of the Board. *Adelman*, 2000 ME 91, ¶ 12, 750 A.2d 577.

6

The interpretation of a local ordinance is a question of law, and the court reviews that determination de novo. *Id.* ¶ 6. The ordinance is interpreted by examining the plain meaning of language and "the terms or expressions are construed reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *Camp v. Town of Shapleigh*, 2008 ME 53. ¶ 10, 943 A.2d 595. "Although interpretation of an ordinance is a question of law, [the court] accord[s] 'substantial deference' to the Planning Board's characterizations and fact-findings as to what meets ordinance standards." *Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048; *see also Summerwind Cottage*, 2013 ME 26, ¶ 11, 61 A.3d 698.

### III. Discussion

Petitioners challenges the Planning Board's Decision alleging that it erred by: 1) transferring grandfathered approvals from Petitioners to Dominator; 2) approving more than the 589 units permitted within the Subdivision; 3) determining that unit density requirements were satisfied; 4) approving development in contravention of dedicated open space requirements; and 5) denying Petitioners notice, a reasonable opportunity to be heard, and due process.

> 1. <u>Whether the Planning Board Erred By Approving Dominator's Use of 24 of the 589 Units Initially Approved for the Dunegrass Subdivision</u>

Petitioners argue that the Planning Board erred by awarding Dominator 24 units from Section B because Dominator was required to obtain the rights to these 24 units before the Planning Board could approve the Subdivision Amendment. In support of this position, Petitioners contend that there is no law supporting the Planning Board's approval and that the approval is inconsistent with Dominator's own agreement—which it subsequently breached—to purchase the development rights at issue. Dominator and the Town respond that the Planning

7

Board did not err because it is not permitted to rely on private agreements or covenants in its decision-making process. Dominator further responds that Petitioners did not cite any authority indicating the alleged development rights at issue exist. Furthermore, Dominator argues that if such rights did exist, they would create an entirely new regime of property rights because there are no private deed covenants reserving the rights Petitioners claim.

"Zoning laws are enacted under the police power in the interest of public health, safety and welfare; they have no concern whatever with building or use restrictions contained in instruments of title and which are created merely by private contracts." *Whiting v. Seavey*, 159 Me. 61, 66 (1963). "The zoning restrictions imposed upon a property owner's land are the measure of his obligations to the community; the private covenant is merely an indication of the measure of his obligation to a private party, which may or may not be enforceable but which cannot, in either event, affect the necessity of conforming to the comprehensive plan set forth in the ordinance." *Id.* (quoting Ziegler, *Rathkopf's The Law of Zoning and Planning,* Chap. 74-13).

Here, the Planning Board approved the Dunegrass Subdivision as set out in the Site Plan. The Site Plan proposed developing 589 residential units, in various allocations, throughout 18 distinct sections. (*See* R. 2.) In order to deviate from the Site Plan, an interested party must seek an amendment from the Planning Board. *See* 30-A M.R.S.A. § 4407. In determining whether to grant the amendment, the Planning Board's focus is whether the amendment satisfies the enumerated criteria. *See* 30-A M.R.S.A. § 4404. The Planning Board need not—and should not—wade into private disputes regarding the ownership of contractual rights to build the proposed development. *Whiting v. Seavey*, 159 Me. at 66. Accordingly, the Planning Board did

8

not err in refusing to consider Petitioners' assertions that Dominator lacked the prerequisite right to build the development at issue.[3]

> 2. Whether the Planning Board Erred in Determining Dominator's Proposed Amendment Does Not Exceed the 589 Units Originally Approved for the Development

Petitioners argue the Planning Board's determination that—including the 24 units at issue in the Dominator's proposal—there were 32 units originally approved for Section B that can be developed in other sections of Dunegrass in the future without exceeding 589 units is clearly erroneous. This is because the Planning Board allegedly disregarded changes to sections A, K, L, and P of the Subdivision that would bring the number of allocated units to 599. In support of this position, Petitioners assert that they provided evidence of the following additional Amendments to the number of units approved in different sections of the Subdivision:

- Section A increase from 28 to 30 units on April 12, 2012;
- Section B decrease from 76 to 24 units on November 3, 2009;
- Section H increase from 5 to 10 units at the same time Section B was decreased;
- Section J decrease from 4 to 3 units, with the remaining unit transferred to Section L, phase 2;
- Section K increase from 56 to 60 units on September 4, 2001;
- Section L increase from 28 to 40 units on February 5, 2009;
- Section M decrease from 40 to 29 units; and
- Section P increase from 10 to 22 units on October 21, 2007.

(Pet's Brief, 4-5.)

The record evidence cited in support of these Amendments, however, does not compel a result contrary to the one reached by the Planning Board. First, the court cannot say that the Planning Board abused its discretion or committed an error of law by focusing its analysis on the

---

[3] This precise issue is being litigated in BCD-CV-16-09.

9

availability of units from within Section B.[4] While a more global perspective may have been advisable, it was not an abuse of discretion—especially given the complicated nature of the Dunegrass Subdivision—to focus on the availability of units in one particular Section of the Subdivision. *See Summerwind Cottage*, 2013 ME 26, ¶ 11, 61 A.3d 698 ("[L]ocal characterizations or fact-findings as to what meets ordinance standards will be accorded substantial deference"). Although the focus on Section B was not an abuse of discretion in this case, the court cautions that this approach may not be acceptable in all instances. Specifically, a determination based on this limited focus would be subject to reversal if there were opposing evidence *compelling* a determination that because of prior amendments, more than 589 units would be approved for the Subdivision.

While Petitioners have attempted to make this showing, they have fallen short and the Board did not err in refusing to address this argument. *See Mueller v. Penobscot Valley Hospital*, 538 A.2d 294, 297 (Me. 1988) (Law Court assumed argument not expressly addressed by Superior Court was rejected and resolved by Superior Court). Petitioners appear to cite to a September 4, 2001 Recorded Plan Amendment to Section K2 to demonstrate an increase from 56 to 60 units within Section K. (*See* R. 17, Ex. 3; *see also* R. 17, Unit Count Spreadsheet.) Although the majority of the writing on the September 4, 2001 Recorded Plan Amendment in the Record is illegible, it appears to show the Planning Board approving an Amendment in which 32 units are present. (R. 17, Ex. 3.) This number coincides with the figures listed in the Petitioner's updated spreadsheet, which divides Section K into Sections K1 and K2, and lists Section K2 as increasing from 28 approved units to 32. (R. 17, Unit Count Spreadsheet.) Even though this

---

[4] The Planning Board's analysis of the units available within Section B is not seriously challenged.

10

evidence supports a finding that the Planning Board approved the addition of four units to Section K2 on September 4, 2001, it does not conclusively establish that the additional four units were not subtracted from another Section of the Subdivision or that the Unit Count Spreadsheet was definitively correct on this and all other issues.

Furthermore, while Petitioners presented evidence that Section P was increased from its originally approved 10 units to 22 units by Recorded Plan Amendment dated October 21, 1997, the record is not clear whether the 12 unit increase was a transfer from another section, an amendment to exceed the 589 units originally approved, or simply not considered by the Planning Board when approving the amendment. (*See* R. 17, Ex. 5.) The same uncertainty afflicts Petitioner's assertion that Section A was increased from 28 to 30 units by plan amendment dated April 12, 2012. (*See* R. 17, Ex. 1.) In light of the deferential standard of review the court must apply, it cannot conclude that the Board abused its discretion by rejecting Petitioners' position and determining that Dominator's Application would not result in more than 589 units approved for the Subdivision.[5]

3. Whether the Planning Board Erred in Finding Dominator's Application Satisfied Density Requirements

Petitioners contend the Planning Board erred by finding that Dominator's Application met the density and unit count requirements for the Dunegrass Subdivision. Specifically, they contend that Dominator's Application violates PMUD regulations regarding unit density for general residential development with sewers. The Town and Dominator respond that since density is a measure of units per area, and the total area of Dunegrass has remained the same

---

[5] Because the Planning Board did not err in its determination that Dominator's Application will not result in more than 589 units approved for Development in Dunegrass, Petitioners' additional arguments stemming from this alleged error fail. (*See* Pet.'s Brief, 23-24.)

11

since its initial approval, the Planning Board reasonably relied on units as a proxy for density and did not err in its determination.

As discussed *supra* Section II(B), the Planning Board did not abuse its discretion in determining that Dominator's Application fell within the 589 units originally approved for the Subdivision. Based on this determination, the Planning Board concluded that the Subdivision "meets the density and unit count requirements for the Dunegrass Subdivision." (R. 10 at 6.) While the PMUD Ordinance sets out specific requirements for general residential density—such as the limit of one unit per 20,000 square feet net development density for units with sewers set out in §78-1025—given the complexity and size of Dunegrass, the Planning Board has historically utilized the unit count as a proxy for density. (*See e.g.* R. 10 at 6, R. 21(E) at 20, 28-29.) This methodology is supported by evidence that the one unit per 20,000 square feet density requirement—with sewer—was satisfied because Dunegrass was less dense than it was in 2009. (R. 22.) Specifically, the submission asserted that Dunegrass satisfied density requirements in 2009, has become less dense since then, remains less dense with the approval of Dominator's Application, and as—as a matter of logic—satisfies the Subdivision wide density requirement.[6] (*Id.*) In light of the substantial deference the court provides the Planning Board as to local characterizations or fact-findings as to what meets ordinance standards, the Court cannot say that the Planning Board erred as a matter of law by using the unit count as a proxy for density compliance. *Summerwind Cottage,* 2013 ME 26, ¶ 11, 61 A.3d 698 (citations and

---

[6] While Record Item 22's calculation that if Dominator's Application is approved there would be 24 fewer units than in 2009 is at odds with the Board's finding that there are only eight additional units within the 589 allotted available after approval, this does not undermine the Board's determination that the Subdivision is less dense than it was in 2009. (*Compare* R. 22, *with* R. 10 at 1.)

12

quotations omitted); *see also 517 Ocean House LLC v. Town of Cape Elizabeth, 2016 Me. Super. LEXIS 88, \*3 (May 10, 2016) (citing Wells v. Portland Yacht Club*, 2001 ME 20, ¶ 10, 771A.2d 371) (a board's decision may be deemed supported by implicit findings if there is sufficient evidence in the record). Furthermore, the evidence does not compel a contrary result as the Ordinance upon which Petitioners rely applies the density requirement to the Subdivision as a whole, not just one particular subsection thereof. *See* Town of Old Orchard Beach, Me., Subdivision Ordinance § 78-1025 (2009) (setting out space and bulk requirements for the entire PMUD).

4. Whether the Planning Board Erred in Finding Dominator's Application Satisfied Dedicated Open Space Requirements

Petitioners contend that the Planning Board erred as a matter of law in determining that Dominator's Application satisfied the Town's ordinances regarding dedicated open space because the golf course does not qualify as "open space" and was not permanently "dedicated" as such. The Town and Dominator respond that Petitioners are relying on an inapplicable definition of "open space" and that the Planning Board properly determined the golf course satisfies the open space requirements.

The purpose of the Town's PMUD Ordinance, in pertinent part, is to "encourage creative and flexible land use design that efficiently maximizes the use of developable land while promoting the integration of new commercial and business development with supporting residential and recreational uses—all within a quality community development. Town of Old Orchard Beach, Me., Subdivision Ordinance § 78-1021 (2001). With regard to the distribution of uses through a PMUD, the ordinance provides that "[a] minimum of 35 percent of the project parcel shall be retained in dedicated permanent open space. Roads, parking lots, utility facilities

13

and easements shall not be eligible for open space designation." *Id.* at § 78-1026(b) (2009). "Open space" is defined by the Town's Zoning Ordinance as "a use not involving…the removal or destruction of vegetative cover…and other wildlife habitat." *Id.* at § 78-1. The Ordinance, however, also contains a definition of "[m]inimum open space," which "means open space in a…PMUD district that is dedicated to remain undeveloped…[and to] provide…either passive or active recreational facilities for the benefit of the owners and users." *Id.* The definition further provides that "[f]or the purpose of this chapter, minimum open space shall not include streets, roads/driveways, sidewalks, parking areas, and maintenance yards, but can include swimming pools, hiking trails, ponds, lawns, athletic fields, and outdoor recreation facilities." *Id.*

Here, the Planning Board did not err in determining that Dominator's proposed Amendment satisfied the PMUD's dedicated open space requirements. First, the more specific definition of "minimum open space, which references "open space in a…PMUD district," applies to Dominator's Application. *See Fleet Nat'l Bank v. Liberty*, 2004 ME 36, ¶ 10, 845 A.2d 1183 (specific statutes favored over general ones). The Planning Board did not err in determining that the golf course fits within this definition because it could qualify as an "active recreational facilit[y]" and/or an "outdoor recreation facilit[y]." Furthermore, there is substantial evidence demonstrating that the Golf Course constitutes more than 35% of the Subdivision. (R. 11(I), (II).)

Second, there is substantial evidence in the record supporting the Planning Board's determination that the Golf Course qualifies as dedicated permanent open space. During the Planning Board's discussion of Dominator's Application at the March 12, 2015 Public Hearing, members of the Planning Board mulled over the dedicated open space requirement and

14

determined to make Dominator "[s]how on a plan dedicated open space by the next regular meeting with submittal to the Town Planner within 2 weeks." (R. 10, p. 6.; R. 21(E) 30-32.) In response to this requirement, Dominator submitted a plan representing the open space of the Subdivision and listing the acreage of said space. (R. 11(II).) While the communication sent on behalf of Dominator delineating the open space does not explicitly state that the area identified will be retained as permanent dedicated open space, the Planning Board appears to have characterized that evidence as meeting the ordinance standard, and the Court cannot say that was an error of law or not supported by substantial evidence. *See Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048; *see also 517 Ocean House LLC v. Town of Cape Elizabeth*, 2016 Me. Super. LEXIS 88, *3 (May 10, 2016) (citing *Wells v. Portland Yacht Club*, 2001 ME 20, ¶¶ 10-11, 771 A.2d 371 (remand not necessary where a general finding has been made and the subsidiary findings are obviously or easily inferred from the record). Furthermore, this determination is supported by testimony from Mr. Pugliares who expressed no intention of developing the golf course such that there is less than 35% dedicated open space available for the Subdivision. (R. 11(E) at 22.)

5. <u>Whether the Planning Board Deprived Petitioners of Notice, a Reasonable Opportunity to be Heard, and Due Process</u>

Petitioners contend they were deprived of notice regarding Dominator's Application despite repeatedly requesting information and the Planning Board's statutory duty to provide notice to individuals who own land abutting the project area. Furthermore, they assert that even after they learned of the proceedings, the Planning Board denied them a reasonable opportunity

15

to be heard and refused to grant them party status even though their grandfathered development approvals were at issue.

The Town and Dominator respond that the meetings and public hearings were properly noticed, Petitioners attended several of the meetings and hearings, were given the opportunity to testify at the February 12, 2015 and March 12, 2105 public hearings, submitted numerous documents to the Planning Board, and substantially participated throughout the underlying process. They further argue that even if Petitioners were entitled to additional notice, they waived any objection to the sufficiency of the notice by participating heavily throughout the review process. In addition, the Town and Dominator contend that the Planning Board is not an adjudicatory body and does not afford "party status" to non-applicants, especially for the purpose of adjudicating private rights.

30-A M.R.S.A. § 4403 governs municipal review of proposed subdivisions. Subsection 2 provides that the "municipal reviewing authority may adopt...reasonable regulations governing subdivisions which shall control" and that "[e]ach stage [of the review process] must meet the time requirements of subsections 4 and 5." 30-A M.R.S.A. § 4403(2). Subsection 3 "governs the procedure to be followed after receiving an application for a proposed subdivision" and provides, in pertinent part, that "[w]hen an application is received, the municipal reviewing authority shall give a dated receipt to the applicant and shall notify by mail all abutting property owners of the proposed subdivision...." 30-A M.R.S.A. § 4403(3)(A). In addition to Section 4403, the Town's Subdivision Ordinance provides that, if the Planning Board decides to hold a public hearing on a final review of a major subdivision, notice must be "advertised in the newspaper of local circulation at least two times, the date of the first publication to be at least

16

seven days before such hearing, and notice of the hearing shall be posted in at least three prominent places at least seven days prior to the hearing. Town of Old Orchard Beach, Me., Subdivision Ordinance § 74-231(f) (1986).

Dominator initially notified the Planning Board of its intention to apply for an amendment to the Dunegrass Subdivision to develop "The Turn" with the submission of a sketch plan on June 16, 2014. (R. 11(A).) On July 10, 2014, counsel for Petitioners wrote the Town Planner a letter requesting an opportunity to be heard regarding Dominator's Application before any action was taken thereon. (R. 20.) The letter enumerated five reasons why approving The Turn would be improper and promised to send "a more complete explanation of [Petitioner's] position along with supporting documents when time allows." (*Id.*) The letter also requested the Town Planner keep Petitioners informed of any future proceedings concerning The Turn. (*Id.*) On December 4, 2014, counsel for Petitioners wrote a letter to the Town Planner, Town Manager, and two of its outside counsel stating that: 1) he understood Dominator's Application would be discussed at the Town meeting that night; 2) he and his clients had not received notice of the proceeding; 3) he was unable to attend the meeting; and 4) he and his clients requested appropriate notice and an opportunity to be heard if the Town was considering any modification to the Subdivision. (R. 12.) Petitioners assert they did not receive notice or other responses to those requests. (Pet.'s Brief 8.)

On December 26, 2014, Dominator submitted a Subdivision Preliminary Application and Plans. (R. 11(C).) The Town mailed notices of the February 5, 2015 Site Walk and February 12, 2015 public hearing regarding Dominator's Application to all abutters, including Barbara Boutet, Inc. and Pine Ridge Realty Corp. (R. 27-30.) The Town also advertised notice of the February

17

12, 2015 public hearing in the Journal Tribune on February 2 and 6 (R. 30(k)-(l)); posted copies of the Board's agendas on the Town's website and on two bulletin boards in the Town Hall (R. 26(a)-(q)); publicly announced the dates for the Site Walk and public hearing at a January 8, 2015 Planning Board meeting (R. 21(c) at p. 25); and advertised all 16 meetings and workshops in which the proposed Amendment appeared on the Board's agendas in the Journal Tribune (R. 30(a)-(o).) The record further demonstrates that both Pine Ridge and Dominator had matters on the Planning Board's agenda for July 10, 2014, August 7, 2014, August 14, 2014, September 4, 2014, and September 11, 2014. (R. 26(a)-(e).) It is also undisputed that between June 10, 2014 and March 23, 2015, Petitioners submitted eight separate cover letters or emails to the Town. (R. 20 (7/10/14 letter), R. 12 (12/4/14 letter), R. 11(T)-(W) (letters sent between 2/9/15 and 3/5/15), R. 17 (3/7/15 email), R. 14 (3/25/15 letter). In addition, Petitioners submitted two letters from their engineer with a review of the density, sewer capacity, and storm water portions of Dominator's Application (R. 11(BB) (3/4/15 letter), R. 18 (3/25/16 letter)); participated in the February 12 and March 12, 2015 public hearings (R. 21(D) at pp. 1-2, R. 21(E) at pp. 23-24, R. 11(AA)); were provided the opportunity by the Board to provide additional comments (R. 21(D) at p. 3); and provided additional comment in response thereto (R. 11(V), R. 11(W)).

Here, the court need not determine whether the Town violated 30-A M.R.S.A. § 4403(3)—by not providing Petitioners notice of Dominator's submission of a sketch plan on June 16, 2014—because Petitioners knowledge of and participation in the review process waived any objection to the sufficiency of notice that was provided. *Crispin v. Town of Scarborough*, 1999 ME 112, ¶ 24, 736 A.2d 241. The record is clear that Petitioners were aware of Dominator's Application by July 10, 2014 and put forth a number of arguments as to why the

18

Application should not be granted. (R. 20.) In that same letter, Petitioners promised to send a more complete explanation of their position with supporting documentation when time permits. (*Id.*) While the Town did not respond to Petitioners' request for personalized notice of additional Board meetings, it was under no obligation to do so. Furthermore, the record is clear that Petitioners were provided ample opportunity to participate in the Planning Board proceedings as they participated at public hearings, provided evidence in support of their position, and explicitly had their concern regarding the unit count addressed in the Planning Board's decision.[7] Finally, the court rejects Petitioners' argument that the Planning Board erred by not granting them "party" status as the Planning Board is not an adjudicatory body and has no obligation to confer such status. *See Cunningham v. Kittery Planning Bd.*, 400 A.2d 1070, 1078-79 (Me. 1979).

## IV. Conclusion

As discussed in greater detail above, the court affirms the Planning Board's April 22, 2015 Decision because the Planning Board did not err by: 1) refusing to resolve Petitioners' dispute with Dominator regarding development rights; 2) determining that Dominator's Application would not exceed the 589 unit sites originally approved for the Subdivision by focusing its calculation on units available from Section B of the Subdivision; 3) using the 589 units as a proxy for density; 4) determining that the dedicated open space requirements were satisfied; or 5) providing Petitioners insufficient notice and opportunity to be heard.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

---

[7] While the Planning Board's treatment of the issue was not to Petitioner's satisfaction, this does not detract from the fact that their concerns were heard.

19

Dated: August 19, 2016

_____/s_____

Michaela Murphy
Justice, Business & Consumer Court